(212 P.3d 239)
No. 100,741

TRACY HERRERA-GALLEGOS, *Appellee*, v. H & H DELIVERY SERVICE, INC., AND COMMERCE & INDUSTRY INSURANCE COMPANY C/O AIG CLAIMS SERVICES, *Appellants*.

Opinion filed July 24, 2009. ■

*Christopher J. McCurdy* and *James L. MowBray*, of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Overland Park, for appellants.

*Randy S. Stalcup*, of Affiliated Attorneys of Pistotnik Law Offices, PA, of Wichita, for appellee.

Before STANDRIDGE,.P.J., BUSER and LEBEN, JJ.

LEBEN, J.: Tracy Herrera-Gallegos hurt her back badly while moving a heavy box for H & H Delivery. Both the administrative law judge and the Workers Compensation Board concluded that she was permanently and totally disabled, meaning that she was unable to engage in any substantial or gainful employment.

Her employer argues that the Board's decision was based on flawed evidence, that her failure to seek out other employment opportunities negates her right to an award, and that she shouldn't have been given an award for future medical expenses where no evidence demonstrated a need for ongoing medical treatment. But we review the Board's factual findings to see whether substantial evidence supports them, and sufficient evidence showed that Herrera-Gallegos was unemployable due to her chronic pain and that she needed additional pain-management treatment. Further, nothing in our workers'-compensation law requires a person who is permanently and totally disabled to try to find a job or lose workers'-compensation benefits. We therefore affirm the Board's award to Herrera-Gallegos.

## Standard of Review

We begin our analysis by noting a change in the standard of review for workers'-compensation cases that took effect on July 1. Under K.S.A. 44-556(a), decisions of the Workers Compensation Board are reviewed under the Kansas Judicial Review Act, K.S.A.

77-601 *et seq.*, which applies generally to appeals from administrative agencies. The statute was amended July 1, 2009, and that change alters our standard of review. See L. 2009, ch. 109, sec. 28 (amending K.S.A. 77-621).

K.S.A. 77-621 has always provided that we review an agency's factual findings to be sure substantial evidence supports them "in light of the record as a whole." But our cases had limited that review by directing that we take the evidence in the light most favorable to the Board's ruling. If we found substantial evidence that would support the Board's decision, we were not concerned about other evidence that might have led to a different conclusion. See *Graham v. Dokter Trucking Group*, 284 Kan. 547, Syl. ¶ 1, 161 P.3d 695 (2007); *Gutierrez v. Dold Foods, Inc.*, 40 Kan. App. 2d 1135, Syl. ¶ 4, 199 P.3d 798 (2009). In addition, if the Board ruled against a party who had the burden of proof on a factual issue, we reviewed the matter under a negative-findings test—we would then uphold the Board's ruling unless it arbitrarily ignored undisputed evidence or the Board acted on bias, passion, or prejudice. *Gutierrez*, 40 Kan. App. 2d 1135, Syl. ¶ 4.

As amended, K.S.A. 77-621 now defines "in light of the record as a whole" to include the evidence both supporting *and detracting from* an agency's finding. Thus, we must now determine whether the evidence supporting the Board's factual findings is substantial when considered in light of *all* the evidence. In addition, the amended statute, K.S.A. 77-621(d), now requires that we consider both the credibility determinations that the hearing officer "who personally observed the demeanor of the witness" made, and if the agency head, here the Board, does not agree with those credibility determinations, the agency should give its reasons for disagreeing. We must consider "the agency's explanation of why the relevant evidence in the record supports its material findings of fact." For us to fairly consider an agency's position should it disagree with a hearing officer's credibility determination, an explanation of the agency's differing opinion would generally be needed. See also L. 2009, ch. 109, sec. 13 (amending K.S.A. 77-527[d] and providing that agency head give "due regard" to hearing officer's ability to observe witnesses and determine credibility).

The statute doesn't define the term substantial evidence, but caselaw has long held that it is such evidence as a reasonable person might accept as being sufficient to support a conclusion. *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 263, 75 P.3d 226 (2003). With the statutory amendments, we have simply been told to look more completely at the record in determining whether substantial evidence supports the agency decision.

The amended statute finally reminds us that we do not reweigh the evidence or engage in de novo review, in which we would give no deference to the administrative agency's factual findings. Indeed, the administrative process is set up to allow an agency and its officials to gain expertise in a particular field, thus allowing the application of that expertise in the fact-finding process. But we must now consider all of the evidence—including evidence that detracts from an agency's factual findings—when we assess whether the evidence is substantial enough to support those findings. Thus, the appellate court now must determine whether the evidence supporting the agency's decision has been so undermined by cross-examination or other evidence that it is insufficient to support the agency's conclusion.

### An Overview of the Evidence and the Board's Ruling

Herrera-Gallegos hurt her back while trying to move a 70-to 80-pound box out of the way. There's no dispute that this injury occurred during the course of her employment with H & H Delivery.

Doctors performed disc-fusion surgery of the L4/L5 discs in November 2004, and a second fusion of the L5/S1 discs in January 2006. Herrera-Gallegos said the doctor who performed the surgery told her she'd never work again.

Dr. Pedro Murati testified regarding his examination of Herrera-Gallegos. He diagnosed her with failed-back-surgery syndrome, and he said that individuals with it experience pain and difficulty in all activities. Based on his examination and a review of her medical records, he said she should rest for 30 minutes every 2 hours. He concluded that she was unable to engage in any substantial or gainful employment due to the level of pain she experienced. He conceded that she could physically do certain work-related tasks,

but he recommended that she not do them because it would cause her too much pain. In addition, he said that if she tried to work, it would cause her so much pain that she'd often have to stay at home to rest her back. He concluded that she was unemployable because "she has lost the ability to [work] to the satisfaction of any reasonable employer."

H & H Delivery presented a different view from Dr. Paul Stein. He reviewed a functional-capacity evaluation and concluded that Herrera-Gallegos could function under light physical-demand restrictions, including that she not lift more than 20 pounds on an occasional basis and no more than 10 pounds on a frequent basis. He concluded that "within the framework of the restrictions that I have provided, she should be able to function." He reviewed lists of tasks she had done in past jobs, noting some (like vacuuming) that she could no longer do but many others (like standing to operate a cash register) that she could do. Even for tasks that she could do, however, the functional-capacity evaluation approved by Dr. Stein recommended that she frequently alternate between sitting and standing.

Two vocational experts, Jerry Hardin and Karen Crist Terrill, testified. Based on Dr. Murati's restrictions, Hardin concluded that Herrera-Gallegos was "essentially and realistically unemployable." Based on Dr. Stein's restrictions, Terrill testified that Herrera-Gallegos had "the ability to earn wages in the open labor market" as a customer-service representative or as a bill collector. But when asked to consider Dr. Murati's restrictions, she conceded that Herrera-Gallegos wouldn't be employable under them:

"Dr. Murati has indicated she needs to rest every two hours for at least 30 minutes and that she is essentially and realistically unemployable. I would then defer to those statements. If Dr. Murati is of the opinion she's essentially and realistically unemployable from a medical standpoint, I would defer to that opinion."

Terrill also testified that Herrera-Gallegos said she hadn't looked for any jobs since her injury because she hadn't been released to go back to work and because the pain made it hard for her to leave her home.

An administrative law judge found that Herrera-Gallegos was permanently and totally disabled. H & H Delivery sought review

by the Workers Compensation Board, but the Board agreed that she was permanently and totally disabled. Both the judge and the Board relied heavily on Dr. Murati's testimony.

I. Substantial Evidence Supports the Board's Finding that Herrera-Gallegos Is Permanently and Totally Disabled.

We begin our review of H & H Delivery's appeal by determining whether, with consideration of the entire record, substantial evidence supports the Board's conclusion that Herrera-Gallegos is permanently and totally disabled. Our statute provides several examples that are presumed to result in total disability, but it otherwise provides that the Board determine whether the person's disabilities have altogether shut them out of the labor market based on the facts of that individual case:

> "Permanent total disability exists when the employee, on account of the injury, has been rendered completely and permanently incapable of engaging in any type of substantial and gainful employment. Loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof, in the absence of proof to the contrary, shall constitute a permanent total disability. Substantially total paralysis, or incurable imbecility or insanity, resulting from injury independent of all other causes, shall constitute permanent total disability. In all other cases permanent total disability shall be determined in accordance with the facts." K.S.A. 44-510c(a)(2).

None of the special situations, like losing both hands, applied to Herrera-Gallegos' case, so the Board had to determine from all the facts whether she was "completely and permanently incapable of engaging in any type of substantial and gainful employment."

The evidence supporting the Board's permanent-and total-disability finding hinges on Dr. Murati's opinion that Herrera-Gallegos should rest for 30 minutes every 2 hours. Both of the vocational experts who testified, Hardin and Terrill, agreed that Herrera-Gallegos would not be employable under that restriction. Accordingly, whether substantial evidence supports the Board's finding depends upon Dr. Murati's opinion. Unless his opinion is greatly undermined by other evidence, the Board's decision would have substantial evidence to support it.

H & H Delivery made several arguments designed to undercut Dr. Murati's testimony. H & H Delivery noted that Dr. Murati

couldn't independently recall Herrera-Gallegos when he testified, that he provided general testimony about people with her condition, that he admitted she hadn't claimed to him that she had difficulty standing or sitting for a specific time length, that he put too much emphasis on the burns Herrera-Gallegos experienced from overusing her heating pad (which H & H Delivery contends has no medical significance), and that he relied upon the functional-capacity evaluation while also criticizing it. But H & H Delivery's attempts to undercut Dr. Murati's testimony did not so undermine it that it may no longer be relied upon by the Board. Dr. Murati is board certified in physical medicine and rehabilitation, and both the administrative law judge and the Board found his testimony credible and persuasive.

The Board noted that Dr. Murati's opinion was more recent than Dr. Stein's and that no doctor had found Herrera-Gallegos to be magnifying her symptoms. The Board also noted that even the functional-capacity restrictions relied upon by Dr. Stein recommended at least frequent alternating between sitting and standing. Herrera-Gallegos had two disc-fusion surgeries but experienced no relief to her pain. The Board also appears to have accepted Herrera-Gallegos' testimony on these points—that her pain continued after the surgeries and that the pain was constant. The Board also made specific note of her testimony that she suffered burns to her back from a heating pad while trying to alleviate the back pain. Taken in combination, the testimony of Dr. Murati, along with that of Herrera-Gallegos, Hardin, and Terrill, provides substantial evidence in support of the Board's factual finding that her injuries prevent her from being gainfully employed.

H & H Delivery also challenges the Board's finding on the ground that Dr. Murati based his recommendations on what Herrera-Gallegos *should* not do rather than what she *could* not do. But even though Herrera-Gallegos could physically perform, at least for some time period, many of the tasks that might be required in a job, Dr. Murati said that in his opinion her pain would interfere with working unless she followed his recommendation to rest for 30 minutes every 2 hours. There's no requirement in K.S.A. 44-510c(a)(2) that a doctor testify definitely that a worker is physically

unable to perform job tasks to be considered disabled. See *Adams v. Ball's Food Stores*, 41 Kan. App. 2d 799, 802-03, 207 P.3d 261 (2008). The Board is free to consider all of the evidence presented on this issue, and substantial evidence provides support for its conclusion.

II. A Person Who Is Permanently and Totally Disabled Is Not Required to Seek Work to Preserve His or Her Rights to a Workers'-Compensation Award.

H & H Delivery separately argues that Herrera-Gallegos should not be able to receive a permanent and total disability award "where she has not made any effort, much less a good faith effort, to find post-injury employment." We are at a loss to understand the logic of this argument. It's obviously contradictory to require someone who is, in the words of our statute, "completely and permanently incapable of engaging in any type of substantial and gainful employment" to put forth a good-faith effort to find and maintain gainful employment. See K.S.A. 44-510c(a)(2). A job search in that circumstance would be the very definition of a fool's errand.

Nor is H & H Delivery's argument based on some language in the workers'-compensation statute. K.S.A. 44-510c(a)(2) simply tells the Board to determine whether a permanent and total disability exists "in accordance with the facts" in cases like Herrera-Gallegos', which is not covered with a special rule. H & H Delivery does not cite any statutory language in support of this argument.

We acknowledge—and H & H Delivery cites to—one unpublished decision of our court in which a panel provided some language supportive of H & H Delivery's position. In *Studyvin v. Wal-Mart*, 2007 WL 2241694 (Kan. App.) (unpublished opinion), *rev. denied* 285 Kan. 1177 (2007), the worker was denied permanent total-disability benefits apparently because she had twice turned down accommodated employment *within* the restrictions set for her by the treating physician. On appeal, she argued that her lack of good faith in finding work wasn't an appropriate consideration in determining whether she had a permanent total disability. A panel of our court disagreed: "If good faith is a requirement for work disability or for a continuation of permanent partial disability benefits,

it is most assuredly a requirement for an award of permanent total disability." 2007 WL 2241694, at *4.

The *Studyvin* panel relied on some past cases in which our court has held that an employee must show good-faith efforts to obtain new employment before obtaining an award for wage losses (referred to as a work-disability award) in excess of functional impairment in cases of permanent partial disabilities. *E.g., Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, Syl. ¶ 6, 944 P.2d 179 (1997); *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 284, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995). But since the development of that doctrine more than a decade ago, our Supreme Court has emphasized that the workers'-compensation statute should be applied as written without the addition of rules not included in the statute. See *Graham v. Dokter Trucking Group*, 284 Kan. 547, 556-57, 161 P.3d 695 (2007); *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 524-25, 154 P.3d 494 (2007). Based on these Supreme Court cases and the lack of any statutory language supporting the rule announced in *Copeland* and *Foulk*, several recent rulings have questioned whether the good-faith rule has retained any validity after *Casco* and *Graham*. See *Gutierrez v. Dold Foods, Inc.*, 40 Kan. App. 2d 1135, 1143, 199 P.3d 798 (2009); *Stephen v. Phillips County*, 38 Kan. App. 2d 988, 995, 174 P.3d 452, *rev. denied* 286 Kan. 1186 (2008); *Kiser v. Tractor Supply Co.*, 2009 WL 1766556, at *1 (Kan. App.) (unpublished opinion); but see *Minden v. Paola Housing Authority*, 2009 WL 596559, at *5 (Kan. App.) (unpublished opinion) (approving Board's use of good-faith test to deny work-disability award); *Purinton v. George J. Shaw Const. Co.*, 2008 WL 5135153, at *3 (Kan. App.) (unpublished opinion) (same).

Two other points should be made with regard to the *Studyvin* ruling and its impact, if any, on Herrera-Gallegos' case. First, the *Studyvin* opinion does not tell us how the worker's alleged lack of good faith affected a determination of whether she could engage in gainful employment. There was other evidence that the worker *was* able to hold a job, including a doctor's conclusion that she was able to work notwithstanding some medical limitations. That fact alone would have supported the Board's denial of a permanent

total-disability award without regard to whether she had rejected any offers of work that would accommodate her medical restrictions. Thus, it's not clear how important the good-faith rule was either to the Board's decision or this court's decision. Second, the cases relied upon in *Studyvin* for a good-faith requirement arose under awards for permanent *partial* disability, not permanent *total* disability. Benefits are figured in a different way for partial-disability awards than for permanent-disability awards. For partial disabilities, a worker can receive an award beyond functional impairment to compensate in part for future lost wages, called a work-disability award. But that award isn't available if the worker is engaging in work for 90% or more of the wages earned at the time of injury. K.S.A. 44-510e(a). Thus, even if not found in the statute, the good-faith rule would serve a logical purpose because the wage earned *after* the injury matters in the statutory calculation of benefits. But in cases of permanent total disability, the statute provides a benefit "equal to 66⅔% of the average gross weekly wage of the injured employee" for a specified time period. K.S.A. 44-510c(a)(1). The benefits are not dependent upon any postinjury wage—presumably because a worker with a permanent total disability can't earn a postinjury wage. Thus, imposing some good-faith requirement at the threat of imputing a postinjury wage serves no purpose in a permanent total-disability case.

In sum, when a worker has suffered a permanent and total disability as defined under the workers'-compensation statute, there's no reason for that person to seek further employment. In addition, the statutory formula for determining the benefit in cases of permanent total disability has no reference to future earnings, which differs from the statutory benefit applicable in permanent partial-disability cases. Thus, however the dispute may ultimately be resolved regarding whether a good-faith requirement should be grafted onto the statute in partial-disability cases, we find no such requirement should apply in total-disability cases. The Board made an award to Herrera-Gallegos for a permanent total disability. Since that award was supported by substantial evidence, she was not required to show any effort to obtain employment in order to

receive the statutory compensation called for in a total-disability case.

III. The Board Did Not Err in Awarding Future Medical Expenses.

H & H Delivery makes one final argument—that the Board wrongly awarded future medical treatment to Herrera-Gallegos. H & H Delivery argues that Herrera-Gallegos "provided no evidence that she would require any future medical treatment," so none should have been awarded. But there was considerable evidence that she was suffering from chronic pain and that her current treatment was not helping. Dr. Murati testified that she needed chronic pain management, such as a spinal cord stimulator and slow-release pain medications. This meets the substantial-evidence test in support of the Board's conclusion that Herrera-Gallegos needed ongoing medical treatment.